From C. P. Addams, Harrisburg, Pa.

# In re Rosenberg's Account

A. M. *Simon* and *Harry R. Levy*, for exceptants; *John A. Metz*, contra.

STADTFELD, J., April 11, 1931.—This case is before the court on exceptions to the report of the auditor appointed to distribute among creditors the purchase money paid into court under the Bulk Sales Act of May 23, 1919, P. L. 262, in execution of a contract for the sale of a stock of merchandise and fixtures in bulk.

On June 8, 1930, Meyer Rosenberg, as liquidating partner of the firm operated by Adolph Herskovitz (absconded), and himself, under the name of Quality Meat and Grocery, contracted to sell the entire stock of merchandise and fixtures of the firm to Henry Gross and Harry Moldovan for the purchase price of $4000.

A sworn statement, such as is required under the Bulk Sales Act, was furnished to the purchasers, who gave notice as required by law. At the time this purchase was made, the stock of merchandise and fixtures was under levy by the Sheriff of Allegheny County under two writs of fieri facias issued against Adolph Herskovitz, individually, under an alleged claim that the stock and fixtures had been fraudulently transferred by Adolph Herskovitz to the partnership within ninety days prior to the time of the levies, and without notice to creditors, such as is required under the Bulk Sales Act.

By mutual agreement among the parties, the sale to Henry Gross and Harry Moldovan was allowed to be consummated, with the understanding that the purchase money should be paid into court as provided in section 3 of the Bulk Sales Act of May 23, 1919, P. L. 262, and the fund thus established should be substituted for the stock and fixtures, and the respective rights of the parties be determined by the court and the fund distributed accordingly.

The auditor has found the following facts:

"1. Prior to March 6, 1928, Adolph Herskovitz operated a grocery and meat store at No. 3026 Jenny Lind Street, in the City of McKeesport, under the trade name of Quality Meat Market.

"2. In conducting this business under his individual responsibility, he incurred certain debts, among which are the claims hereinafter listed under schedule 'A' attached hereto.

"3. On March 6, 1928, Adolph Herskovitz and Meyer Rosenberg entered into written articles of copartnership, establishing a firm between them under the trade name of Quality Meat and Grocery, and on that date the new firm commenced business at No. 3024 Jenny Lind Street, which was next door to the place where Adolph Herskovitz operated his store individually.

"4. Under the terms of the articles of copartnership, Meyer Rosenberg agreed to contribute $2156.79 in money, and Adolph Herskovitz agreed to contribute his stock of merchandise, fixtures and book accounts at an equal value of $2156.79.

"5. On the same date, March 6, 1928, Adolph Herskovitz delivered his store with the stock of merchandise and fixtures and book accounts to the firm as his contribution to the partnership fund. The stock and movable fixtures, excepting a counter and the Frigidaire, were immediately transferred to the new location next door. The Frigidaire with its equipment, which required the assistance of specially skilled workmen, was not moved until March 17, 1928, and was re-connected in the new location on March 19, 1928. The counter was moved to the new location on March 17, 1928.

"6. On the date of commencing business, which was March 6, 1928, Meyer Rosenberg contributed to the firm the sum of $1000, and additional sums amounting to $447.50 were contributed at various times, making a total of $1447.50 contributed by him to the partnership fund.

"7. At the time of transferring his stock of fixtures and merchandise to the firm, Adolph Herskovitz gave no notice whatever to his individual creditors and no attempt was made to comply with the provisions of the Bulk Sales Act.

"8. On March 22, 1928, Adolph Herskovitz and Meyer Rosenberg registered their business under the name of Quality Meat and Grocery, as is required by the Fictitious Names Act of 1917, P. L. 645, and its amendments.

"9. On May 26, 1928, Adolph Herskovitz absconded with $575 in money belonging to the firm. In addition to this sum, he had withdrawn from the partnership at various times sums totaling $1331.59, thereby making his total withdrawals $1906.59.

"10. On June 2, 1928, two judgments were entered against Adolph Hersko vitz by his individual creditor, Itzkovitz & Co., as will appear by reference to the record thereof at Nos. 2582 and 2583, July Term, 1928, D. S. B., in the sum of $395.40 and $150.97, respectively. On the same date writs of fieri facias were issued upon both judgments and levies were made by the sheriff upon the goods and fixtures in possession of Meyer Rosenberg, liquidating partner of the partnership operated by the Quality Meat and Grocery.

"11. On June 8, 1928, Meyer Rosenberg, acting as liquidating partner, contracted to sell the stock of merchandise and fixtures of the partnership to Henry Gross and Harry Moldovan for the sum of $4000.

"12. On June 12, 1928, Max Selkowitz, on behalf of himself and other creditors of Adolph Herskovitz, individually, filed a bill in equity at No. 3025, July Term, 1928, naming as defendants Adolph Herskovitz, Meyer Rosenberg, Henry Gross and Harry Moldovan, complaining that Adolph Herskovitz had fraudulently sold and transferred his stock of merchandise and fixtures other than in the ordinary course of business to the firm operated under the name of Quality Meat and Grocery Company without notifying the plaintiff and his individual creditors, as required by the Bulk Sales Act, and praying that the defendants be held accountable for the fair value thereof.

"13. On June 13, 1928, a rule for a sheriff's interpleader was obtained upon both executions above mentioned, and on June 19, 1928, both claimants and plaintiff filed answers thereto. No further proceedings were had upon these executions.

"14. On June 26, 1928, Henry Gross and Harry Moldovan, the purchasers of the stock and fixtures from Meyer Rosenberg, the liquidating partner, presented their petition to court and, in pursuance of an order made thereon, paid into court the sum of $3034.49, being the balance of the purchase money after making certain deductions therein set forth.

"15. The sheriff's appraisers, in fixing the value of the goods levied upon under the two writs of execution, appraised them as follows: Merchandise, $378; fixtures, $1295; total, $1673.

"16. No further action was taken on the two writs of execution or upon the bill in equity filed as aforesaid, and the contending parties acquiesced in this procedure and have contended for their share in the distribution of the fund paid into court as their interest may appear."

The auditor has found as a conclusion of law that the formation of the partnership between Adolph Herskovitz and Meyer Rosenberg on March 6, 1928, and the transfer by Adolph Herskovitz of his individual assets to the firm, without attempting to comply with the Bulk Sales Act of May 23, 1919, P. L. 262, as his contribution to the partnership, did not constitute a fraud upon his individual creditors under the provisions of said act.

The auditor distributed the fund, after payment of costs and fees, to the partnership creditors to the extent necessary to pay the latter's claims and awarded the balance to Meyer Rosenberg as liquidating partner for partnership account.

Exceptions to the distribution as aforesaid were filed on behalf of the individual creditors of Adolph Herskovitz in not finding, inter alia, that the contribution by Adolph Herskovitz of his store and fixtures to the said partnership was a sale of the same within the meaning of the Bulk Sales Act of May 23,

1919, P. L. 262, and the failure to comply with the provisions of said act rendered the alleged sale fraudulent and void as to said creditors and in not distributing the fund first, to the extent necessary, to the payment of the claims of said individual creditors.

The following are substantially the questions raised:

1. Where one person contributes a stock of merchandise and fixtures as his contribution to a partnership, and the other partner contribute cash, is such a contribution of merchandise and fixtures a sale within the meaning of the Bulk Sales Act of 1919?

2. If the provisions of the Bulk Sales Act should apply to such a contribution, would the issuing of a fieri facias within ninety days by a judgment creditor of the partner whose contribution consisted of merchandise and fixtures be taking such action as is contemplated and required by the Bulk Sales Act of 1919?

3. Was the bill in equity which was filed by one of the creditors of the partner who contributed the stock of merchandise such a bill as is contemplated by the Act of 1919?

The first question is the important one. The same, so far as we have been able to discover, has not been passed upon either by the appellate courts or by any of our common pleas courts in this state.

Section 1 of the Bulk Sales Act of 1919 provides as follows:

"It shall be the duty of every person who shall bargain for or purchase . . . any stock of goods, wares, merchandise of any kind and fixtures, in bulk, for cash or on credit, before paying to the vendor or his agent or representative or delivering to the vendor or his agent any part of the purchase price thereof, or any promissory note or other evidence therefor, . . . to demand of and receive from such vendor or agent . . . a written statement," etc., of his creditors.

Section 3 of the same act provides as follows:

"Section 3. Whenever any person shall bargain for or purchase, or sell as an auctioneer or as agent, bargained for or purchased for another, any stock of goods, wares, or merchandise of any kind, or fixtures, or of goods, wares, or merchandise of any kind and fixtures, in bulk, for cash or on credit, and shall pay any part of the purchase price to such vendor, or execute or deliver to the vendor thereof or to his order, or to any person for his use, any promissory note or other evidence of indebtedness for said purchase price or any part thereof, without first having demanded and received from said vendor or from his agent the statement provided for in section 1 of this act and verified as therein provided, and without paying or seeing to it that the purchase money of said property is applied to the payment of the bona fide claims of the creditors of the vendor pro rata according to the dignity of their several claims as shown upon such verified statement, and without first having sent the notices of said sale and said statement of creditors, as provided for in section 2 of this act—then such sale or transfer shall be fraudulent and void, and such purchaser, auctioneer, or agent shall, at the suit of any creditor, be held liable to the creditors of the said vendor as a receiver for the fair value of all the property so bought or sold by him."

The Bulk Sales Act of 1919 supplanted a similar Act of March 28, 1905, P. L. 62. This legislation is in derogation of the common law, and, therefore, must be strictly construed and not extended by implication.

In Foster v. Com., 8 W. & S. 77, the court said:

"Every statute is to be brought as near as may be to the common law, which is to be displaced no further than is necessary to make room for the remedy,

and not to be repealed by anything less than express enactment or unavoidable implication."

In Smith *v.* Altoona & Philipsburg Connecting R. R. Co., 182 Pa. 139, the court said: "The intention of the legislature to abrogate the common law by a statute must plainly appear, more plainly indeed than its intention to repeal a prior statute."

In Fibre Yarn Co., Inc., *v.* Tiberio, 1 D. & C. 645, the court holds that Bulk Sales Acts are in derogation of the common law and are, therefore, strictly to be construed.

To the same effect, as directly applicable to this act, see Gitt *v.* Hoke et al., 301 Pa. 31. Opinion by Mr. Justice Walling.

The act provides that whenever any person shall bargain for or purchase any stock of goods, etc., in bulk for cash or on credit, and shall pay any part of the purchase price to such vendor, or execute or deliver to the vendor thereof or to his order or to any person for his use, any promissory note, etc., then such sale or transfer shall be fraudulent and void, and such purchaser, etc., at the suit of any creditor, shall be held liable to the creditors of the vendor as a receiver for the fair value of all property so bought or sold by him.

Rosenberg did not purchase any merchandise in bulk or otherwise from Herskovitz. Neither did he pay Herskovitz in cash or otherwise for any merchandise.

Neither can it be said that the partnership purchased any merchandise in bulk from Herskovitz or that the partnership paid Herskovitz either in cash or by notes or other evidence of indebtedness for any merchandise.

In the case of West Shoe Co. *v.* Lemish et al., 279 Pa. 414, 417, the court said:

"The purpose of the Act of May 23, 1919, P. L. 262, supplanting that of March 28, 1905, P. L. 62, was to protect creditors against the sales of stock in hand as a whole, to the prejudice of those unpaid, and who could look to the assets alone for the satisfaction of their claims."

The question here involved has, however, been passed on in other jurisdictions.

A similar statute in force in the State of Washington, prior to the passage of the Act of 1919 in this state, is almost the same, verbatim. It provides:

"It shall be the duty of every person who shall bargain for or purchase any stock of goods, wares or merchandise in bulk, for cash or on credit, before paying to the vendor, or his agent, any part of the purchase price thereof, or any promissory note or other evidence therefor, to demand and receive from such vendor or agent . . . a written statement," etc., of creditors: Remington's Code, section 5296.

In construing this act, in Maskell *v.* Spokane Cycle and Auto Supply Co., 100 Wash. 16, the court held that a transfer in good faith by a debtor to a corporation in consideration of the issuance of shares of its capital stock is not a "sale" of the stock of goods in bulk "for cash" or "on credit" requiring the debtor to make a sworn statement of his creditors as required under the Bulk Sales Act quoted from that state. The decision reads:

". . . We are of the opinion, as was the court below, that the transfer was not a sale within the bulk sales law. The statute uses the words 'cash' and 'credit' in regulating such transfers. The common meaning of the word 'cash' is 'money:' 1 Words and Phrases, 995.

"We have held that the object of the bulk sales law was to prevent the vendor, usually a retail merchant, from selling his stock of goods, pocketing the proceeds and leaving his creditors remediless: McAvoy *v.* Jennings, 44 Wash. 79, 87 Pac. 53; Kasper *v.* Spokane Merchants Ass'n, 87 Wash. 447,

151 Pac. 800; and in the latter case, that no such result followed where the property was so disposed of as to make it available to the creditors; and, hence, the reason for the rule failing, the rule itself failed.

"We certainly would not hold that a creditor was remediless where a merchant transferred his stock of merchandise in bulk to another for an adequate exchange of real estate; for the real estate would be as available to the creditors as the stock of goods. While we might be disposed, in upholding the object of the act, to consider commercial paper, bonds, warrants and other securities as the equivalent of cash because of their easy disposition and convertibility into cash for the protection of creditors, such a case is not analagous to that here.

"Where no fraudulent intent taints the transaction, a debtor may transfer his property to a corporation which he has formed in consideration of the issuance to him of its capital stock, and of that his creditors cannot complain. The corporate stock is as available for the satisfaction of the claims of creditors after the transfer of the merchandise as the merchandise was before.

"There was nothing illegal or improper in the formation of the plaintiff company nor in the transfer to it by Holt and Chipman of the property in question. At the time the company was formed that firm appeared to have been solvent, and there is nothing to show that it was intended as a fraud upon their present or future creditors. It was not a withdrawal of their property from the grasp of creditors. On the contrary, it remained subject to their claims, though in a changed form. The interest of the partners in the corporation was represented by stock. This stock was as much liable to the demands of the creditors as was the property itself before the formation of the company: Coaldale Coal Co. v. National State Bank, 142 Pa. 288."

In the State of Georgia a bulk sales act, almost verbatim with the Pennsylvania act, is in force. It reads as follows:

"It shall be the duty of every person who shall bargain for or purchase any stock of goods, wares or merchandise in bulk, for cash or credit, before paying or delivering to the vendor any part of the purchase price therefor, to demand and receive from the vendor thereof, and if the vendor be a corporation, then from the managing officer or agent thereof, a written statement under oath of the names and addresses of all creditors of said vendor, together with the amount of indebtedness due and owing by said vendor to each of such creditors; and it shall be the duty of said vendor to furnish such statement. It shall further be the duty of said vendor to give to the vendee a statement of his assets and liabilities and the cost price of the merchandise to be sold, said cost price to be arrived at by an inventory taken at the time by the seller and purchaser:" Acts of 1905, page 92, section 3226; Georgia Code, 1926, page 853.

In Yancey v. Lamar-Rankin Drug Co., 140 Ga. 359, it was held that the provisions of the Bulk Sales Act just quoted did not apply to a transaction where a copartnership composed of two persons engaged in a grocery business sold a two-third interest in their stock of goods to two other persons, whereupon one of the original partners retired from the firm, and the same business was thereafter conducted in the name of the new firm, composed of the remaining partner and the two purchasers. The court said:

"While it may have been out of the usual and ordinary course of business or trade, it was not a sale or transfer of a stock of goods, wares or merchandise."

Exceptants' counsel refer to Virginia-Carolina Chemical Co. v. Bouchelle, 12 Ga. App. 661, where a debtor sold a half interest in his business to another and later sold the other half to the same person, so that the latter became the sole owner of the stock of goods. It was there held that the sale came within

the statute as to a creditor whose claim existed against the original owner of the business before the first sale, as the same was clearly a subterfuge to avoid the provisions of the act.

Counsel for exceptants cite in support of their contentions the case of Marlow v. Ringer from the West Virginia Supreme Court of Appeals, 79 W. Va. 568, 91 S. E. 386, and Daly v. Sumpter Drug Co., 127 Tenn. 412, in both of which it was held that the sale of a half interest in a business, in which an equal partnership was formed between the vendor and purchaser, came within the provisions of the bulk sales law. These decisions are not, however, in harmony with the principles laid down by our Supreme Court in relation to this legislation, and, therefore, cannot be followed.

We believe that the auditor correctly held that the formation of the partnership between Adolph Herskovitz and Meyer Rosenberg and the contribution by Herskovitz to the copartnership of the latter's merchandise and fixtures was not a fraud upon the latter's individual creditors. The transaction was not for "cash," nor was it "on credit." After it was concluded, there was nothing that might be distributed among his creditors.

If the decision be the subject of criticism as opening the door to fraud and dishonesty, the remedy lies not with the courts but with the legislature. It is not within the power of the courts to extend the act beyond its clear provisions.

As to the second question, we are of the opinion that the issuing of a fieri facias and levy upon the merchandise and fixtures is not the remedy contemplated by the Bulk Sales Act of 1919. While this may have been the proper remedy under the prior Act of 1905, as held by our appellate courts, it is clearly not the correct method under the present act.

Section 3 of the Act of 1919 provides:

". . . then such sale or transfer shall be fraudulent and void, and such purchaser, auctioneer, or agent shall at the suit of any creditor be held liable to the creditor of the said vendor as a receiver for the fair value of all the property so bought or sold by him."

In the case of Miller v. Myers et al., 300 Pa. 192 (1930), in an opinion by Mr. Justice Walling, the Supreme Court held that under the Act of 1919 the liability of the vendee is neither personal nor general, but the purchaser is merely made a receiver for the fair value of the property if he fails to comply with the provisions as to preliminary notice; and even this responsibility can be terminated by payment of that amount into court when the vendee disregards the legislative mandate.

In the case of Waverly Oil Works v. Farbacher, 76 Pitts. L. J. 63, Judge Martin held that equity is the only remedy contemplated by the Act of 1919. Quoting from his opinion (page 64):

"The question for decision, therefore, is whether a purchaser of goods in bulk bought in violation of the Bulk Sales Act is liable in an action of assumpsit to a creditor of the vendor for goods sold and delivered to the vendor. The Bulk Sales Act provides that a sale or transfer in violation of the act 'shall be fraudulent and void, and such purchaser, auctioneer or agent shall, at the suit of any creditor, be held liable to the creditors of the said vendor as a receiver for the fair value of all the property so bought or sold by him. . . .' It is clear that the liability thus put upon the purchaser is a general liability to all the creditors of the vendor and that it is limited in its extent to the fair value of all the property bought. It is true that the rights of all creditors may be determined 'at the suit of any creditor,' but this does not mean that each creditor may bring a separate action of assumpsit to enforce his individual claim. If this were permissible, general judgments could be entered in the aggregate

amount of the claims of all creditors, thus enforcing against the offending purchaser a liability beyond that which the statute puts upon him.

"An action of assumpsit does not afford the comprehensive remedy necessary to enforce the right granted by the statute, nor does it provide a convenient method of determining who are creditors and who are not and what is the fair value of all the property bought. We are of opinion that these reasons justify the conclusion that assumpsit does not lie and that a bill in equity is the remedy contemplated by the statute. This is directly ruled in two cases in the courts of common pleas of this Commonwealth: Felix v. Urquhart Mfg. Co., 5 D. & C. 93; Callahan v. Miller Co., Inc., No. 2, 11 Lehigh Co. L. J. 119. Two cases have been before the appellate courts of our state in which bills were filed to enforce liability under this act, and although in neither case was the question raised directly, it is significant that neither the Supreme nor Superior Court questioned the right to maintain the bill. These cases are reported as West Shoe Co. v. Lemish, 279 Pa. 414; Gibbon v. Arronson, 80 Pa. Superior Ct. 36."

As to the third question, we are of the opinion that the bill in equity was not filed within ninety days from the date of the consummation of the transaction between Rosenberg and Herskovitz. As between the partners, the interest in the merchandise and fixtures passed at the time of the formation of the copartnership. Particularly with reference to the Frigidaire and scale, both of which were held by Herskovitz under bailment leases, the latter could sell only his interest thereunder.

The court is, therefore, of the opinion that the exceptions to the auditor's report should be dismissed and the report and schedule of distribution confirmed. From William J. Aiken, Pittsburgh, Pa.